The BLUE WATER CORPORATION, INC., et al., Respondents,

v.

Terrance S. O'TOOLE, Appellant.

No. C4-82-1074.

Supreme Court of Minnesota.

July 15, 1983.

Reargument Denied and Stay Vacated Aug. 10, 1983.

Irving Nemerov, Sean Rice, Minneapolis, for appellant.

Hansen, Dordell, Bradt, Odlaugh & Bradt and J. Mark Catron, St. Paul, for respondents.

WAHL, Justice.

The Blue Water Corporation, Inc. (Blue Water) and its incorporators individually brought this legal malpractice suit against defendant Terrance O'Toole, claiming that his negligence had caused their failure to obtain a bank charter from the Minnesota Commerce Commission. A jury found negligence and awarded damages of $100,000 for lost profits that the bank might have earned had the charter been obtained. O'Toole appeals from an order of the Ramsey County District Court denying his motion for judgment notwithstanding the verdict or a new trial. We reverse.

The individual plaintiffs, a group of mostly local businessmen in Longville, Minnesota, had hoped to open a bank in Longville because there were no banking facilities within a distance of 22 miles. Longville, located in a lake resort-logging area of north central Minnesota, has a population of 171, which swells to 10,000 during the resort season. The group, seeing the possibility of a successful business venture, retained O'Toole, who had been recommended as having expertise in the bank charter application process. Each of the ten original members of the group contemplated investing between $20,000 and $50,000 and was capable of investing that amount.

O'Toole first met with the group in October 1974, at which time he outlined the steps necessary to launch their venture. They were to incorporate Blue Water for the purpose of obtaining a bank charter, assemble $10,000 to finance a feasibility study, commission the study, and locate a banker, as none of them had banking experience. O'Toole gave them the incorporation papers, which they completed and returned to him in March 1975. He filed the papers immediately thereafter.

The parties next met in July 1975, when the group, now incorporated as Blue Water, supplied O'Toole with $4,500 of the $10,000 necessary for the feasibility study. The group decided to do an inexpensive preliminary study before incurring the expense of a full-scale study, as a similar effort to obtain a Longville bank charter in the past had been unsuccessful. They did not wish to proceed absent a good probability of success.

In September 1975, O'Toole contracted with Development Concept Corporation of Minneapolis (DCC) for the preliminary feasibility study, to be followed by a full-scale study if the initial results proved to be positive. DCC does market research for bank charter applications, including attitudinal studies to determine public demand and to identify specific community needs. DCC also gathers information for the application relating to the demographics of the area, potential commercial and household growth, and anticipated deposits, profits and losses, inter alia. If the charter application is opposed by neighboring banks, DCC provides expert testimony at the hearings that take place before the Commerce Commission.

Lee Maxfield, one of the founders of DCC, who had experience with 15 to 20 bank charter applications, had responsibility for the Longville study. He began work on the study in October 1975, meeting with members of the group in Longville. When no report was forthcoming from Maxfield by June 1976, O'Toole wrote for a status report. In response to O'Toole's inquiry, Maxfield indicated a probable "go-ahead" for the Longville application as planned but recommended delaying the application process pending action by the Commerce Commission on the Nisswa, Minnesota bank charter application. Nisswa, a small resort town near Longville, had a history of two unsuccessful bank charter attempts. Maxfield felt that the similarities between the two towns were sufficient to warrant awaiting the Commission's ruling on Nisswa, as a favorable Nisswa result would be indicative of Longville's chances for success. O'Toole relayed this recommendation to the group by letter on July 8, 1976. There is no indication in the record that the group was unwilling to follow this advice.

The Nisswa application was approved in September 1976, 10 months after it was filed, and Maxfield related this news to O'Toole in a letter dated October 27, 1976, in which he recommended that the Blue Water group proceed with the application and indicated that his preliminary study would be completed within the following few weeks. O'Toole sent a copy of Maxfield's letter to the group immediately, asking them to inform him when they would be available to meet with him and Maxfield.

Robert Blais, president of the Blue Water corporation, testified that upon receipt of O'Toole's letter, the group authorized Blais' wife to write back to appellant requesting a meeting as soon as possible. Mrs. Blais wrote notes on O'Toole's letter indicating that she mailed letters to him on November

2, 1976, and again on March 25, 1977, but the letters or copies thereof could not be located at time of trial. Nor could anyone, including Maxfield, produce a copy of the preliminary feasibility study that Maxfield testified he completed within one month of his October 27th letter to O'Toole. In apparent response to the group's March 25, 1977 letter, O'Toole wrote, on March 30, 1977, that he would set up a meeting within a week, but there is no evidence that he did so, and members of the group testified that they could not reach him by phone.

Blais, whose father was a director of the Security State Bank of Remer, Minnesota at that time, testified that the impetus for the March 25th letter to appellant was that Blue Water had information that the two banks closest to Longville, the First National Bank of Walker and the Remer bank, planned to establish branch banks in Longville if a current bill in the legislature allowing branch banks within 25 miles of the main bank became law. Blais admitted under cross-examination that this information was "very possibl[y]" never conveyed to O'Toole. O'Toole was unaware of both the impending change in the law and the Walker-Remer branch rumors until Blue Water member William Koons wrote him on July 27, 1977 that both banks had leased property with option to buy in Longville for the purpose of installing branch banks.

Minnesota Statutes § 47.52 (1982), enacted in 1977 Minn.Laws ch. 378 §§ 1 and 2, was approved June 2, 1977 and became law on August 1, 1977. The Remer and Walker branch applications had been submitted to the Commerce Commission prior to the effective date of the law and were approved on August 21–22, 1977. O'Toole had taken no steps to submit an application after receiving Koons' July 27th letter, nor did he travel to Longville at his clients' urgings to discuss the proper action to take. As late as August 10, 1977, he wrote to Koons as follows:

> I am sure that, if you wish to proceed, the Commerce Department would look more favorably on you than it would on the Remer or Walker banks. To proceed would necessitate the Development Concept Corporation doing a study, and I could arrange for a meeting sometime next week to get started.

Blue Water's reason for existence, to provide banking facilities in Longville, was preempted by the approval of the Remer and Walker branch applications. The group, blaming the lost opportunity on O'Toole's failure to file a timely application, brought this suit. O'Toole argues on appeal that the trial court erred in denying his motion for judgment notwithstanding the verdict or a new trial on the ground that there was insufficient competent evidence as to causation and damages to sustain the jury verdict and that there was error in the jury instructions and special verdict.

We have stated frequently in recent cases that the applicable standard to be applied in determining the propriety of the trial court's granting or denying a motion for judgment notwithstanding the verdict is whether there is any competent evidence reasonably tending to sustain the verdict. *Conover v. Northern States Power Co.,* 313 N.W.2d 397, 401 (Minn.1981); *Sikes v. Garrett,* 262 N.W.2d 681, 683 (Minn.1977); *Seidl v. Trollhaugen, Inc.,* 305 Minn. 506, 507, 232 N.W.2d 236, 239 (1975). Such a motion "admits every inference reasonably to be drawn from the evidence as well as the credibility of the testimony for the adverse party," and should not be granted unless reasonable minds can reach but one conclusion against the verdict. *Id.* A review of the entire evidence is required. *Sikes v. Garrett,* 262 N.W.2d at 683.

To prevail in a legal malpractice suit, a plaintiff must establish four elements: (1) the existence of an attorney-client relationship; (2) acts constituting negligence or breach of contract; (3) that such acts were the proximate cause of the plaintiff's damages; (4) that but for defendant's conduct the plaintiff would have been successful in the prosecution or defense of the action. *Togstad v. Vesely, Otto, Miller & Keefe,* 291 N.W.2d 686, 692 (Minn.1980); *Christy v. Saliterman,* 288 Minn. 144, 150, 179 N.W.2d 288, 293–94

(1970). Failure of proof on any one element defeats recovery. *Godbout v. Norton,* 262 N.W.2d 374, 376 (Minn.1977), *appeal dismissed,* 437 U.S. 901, 98 S.Ct. 3086, 57 L.Ed.2d 1131 (1978). O'Toole does not dispute that an attorney-client relationship existed, nor, as the trial court notes, does he seriously protest his negligence after Maxfield's October 1976 "go-ahead" letter, although Blue Water produced no expert testimony on an attorney's standards of care under these circumstances. He does claim, however, that, even if negligent, his negligence was not the proximate cause of Blue Water's failure to receive a bank charter and make the profits the plaintiffs claim to have lost.

■ The burden of the Blue Water plaintiffs in this case is twofold. First, they must prove that O'Toole, the attorney they retained to help them get a bank charter, was negligent in failing to file a bank charter application on their behalf so that it could have been acted upon by or at least have been pending before the Commerce Commission prior to August 1, 1977. They must then establish that, had the application been timely filed, the Commission would have granted them the bank charter. Just as an attorney's failure to file a medical malpractice suit within the statute of limitations is not enough to permit recovery by a legal malpractice plaintiff absent proof that the plaintiff had a recoverable claim for medical malpractice, *Christy v. Saliterman,* 288 Minn. at 150, 179 N.W.2d at 293, so O'Toole's failure to file an application for a bank charter, prior to the effective date of a law allowing branch banks, is not enough to permit recovery by Blue Water absent proof that the Commerce Commission would have considered the application favorably and granted the charter.

■ Admitting every inference reasonably to be drawn from the evidence, as well as crediting the testimony for Blue Water, it appears possible that, had the bank charter application been filed soon after the Nisswa bank received its charter in November 1976 there would have been enough time for completion of the full-scale study

and for the Commerce Commission to have held a hearing on the application and to have acted on it by August 1, 1977, had there been no opposition to the application from other banks. Witnesses for both Blue Water and O'Toole, however, expected opposition to the new charter from the neighboring banks. The only two charter applications comparable to Longville's which Maxfield knew were opposed by other banks took 10 months each for the Commission to process. Consequently, it is not reasonable to believe that the application, even if filed with all due diligence under the facts and circumstances of this case, could have been acted on by August 1. At most, but for O'Toole's negligence, it was reasonably probable that an application would have been pending before the Commission when the law changed on August 1, 1977 to permit branch banks in Longville.

What then is the competent evidence reasonably tending to support the determination that the Commission would have granted Blue Water the charter with or without receipt of the Walker and Remer applications for branch banks? Maxfield testified that the Commission preferred chartered banks over branch banks because they offer fuller services to their customers. The evidence indicated, however, that between 1975 and 1980 only 11 new charters were granted in Minnesota, whereas between 1978 and 1980, 134 branch offices were approved while only three were denied.

The Commerce Commission, in considering a charter application, is bound by the statutory criteria set out in Minn.Stat. § 45.07 (1982) and given, in this case, to the jury by the trial court.

If the applicants are of good moral character and financial integrity, if there is a reasonable public demand for this bank in this location, if the organization expenses being paid by the subscribing shareholders do not exceed the necessary legal expenses incurred in drawing incorporation papers and the publication and the recording thereof, as required by law, if the probable volume of business in this location is sufficient to insure and main-

tain the solvency of the new bank and the solvency of the then existing bank or banks in the locality without endangering the safety of any bank in the locality as a place of deposit of public and private money, and if the department of commerce is satisfied that the proposed bank will be properly and safely managed, the application shall be granted otherwise it shall be denied.

In *Wesely v. Minnetonka State Bank,* 293 Minn. 386, 198 N.W.2d 158 (1972), we held that the Commerce Commission properly denied an application for a bank charter where the applicants failed to prove that the organizational expenses paid by the subscribing shareholders did not exceed the necessary legal expenses incurred, that the proposed bank would be properly and safely managed, and that there was a reasonable public demand for the proposed bank in the proposed location. A failure of proof of any one of the essential statutory requirements, even the least significant, justifies a denial of a charter by the Commission. *Id.,* 293 Minn. at 389, 198 N.W.2d at 160. Blue Water plaintiffs in the case at bar offered no evidence to meet the statutory requirement concerning the limit on organizational expenses not exceeding legal expenses and insufficient evidence of public demand. They, in effect, asked the jury to infer public demand from the inconvenience of having to drive over 20 miles for banking services. Furthermore, proof of safe and proper management was limited to statements that they planned to hire a banker and retired banker Bremicker's testimony that he would have been interested in the position.

To determine whether public demand was proven, it is necessary to consider the public-demand criteria set out in *Jackson v. Valley National Bank,* 277 Minn. 293, 295, 152 N.W.2d 472, 474 (1967) (footnotes omitted):

(1) Number of banks already serving the area in which the proposed bank would locate; (2) size of area; (3) population of area; (4) wealth of residents of area; (5) commercial and industrial development of area; (6) potential growth of area; (7) adequacy of the services being provided by existing banks compared to the needs of residents and the services to be offered by proposed bank; (8) capability of existing banks to handle potential growth of the area; (9) convenience of the location of existing banks to residents of the area as compared to convenience of the proposed bank; (10) size of banks in area; (11) dates when the banks in the area were established; and (12) the number of persons in area who desire to use the proposed bank and the amount of business they would generate.

In light of these criteria, there was no evidence that the well-established Remer and Walker banks were not completely servicing the area and that they would be unable to accommodate future growth. There was evidence as to population and household growth, but evidence of commercial or industrial development was limited to statements of increased real estate valuation and expanding tourism. Evidence of the nature and sales of existing businesses, resorts, and the logging industry was lacking, as well as prospects for new business development. There was no evidence of persons or businesses desiring to use the new facility, other than plaintiffs and banker Bremicker, as no local attitudinal studies were done. Evidence of local demand at trial consisted of Maxfield's estimates of percentages of people in the projected service area who would use the new bank, and their estimated savings. There was no existing copy of the preliminary study Maxfield testified he had completed, and the full study, as contemplated by the original contract as a necessary adjunct to the bank charter application, was never done.

Deciding what action an administrative agency vested with broad discretion would take is inherently problematic for judges and juries. We cannot infer on the record before us that the Commission would have granted a charter where at least two of the statutory requirements were not established. We hold that the motion for judgment notwithstanding the verdict should have been granted, because the evidence

presented by Blue Water on the issue of causation does not reasonably tend to sustain the verdict. The jury's finding of causation rested on impermissible conjecture. *Smith v. Knowles,* 281 N.W.2d 653, 656 (Minn.1979).

We need not consider the court's instructions or reach the issue of whether the damages awarded for lost profits of an unestablished business were too speculative to be sustained. We reverse and remand with instructions to grant judgment notwithstanding the verdict and to vacate the damage award.

Reversed and remanded.